USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/28/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

TYRONE LASTER,                        :

            Plaintiff,                :        REPORT & RECOMMENDATION

        - against -                   :        07 Civ. 8265 (DAB)(MHD)

DET. ROBERT J. MANCINI, 43 PCT.,     :
P.O. DOUGLAS VINCENT, 43 PCT.
#31914, LT. GRIBBEN, 43 PCT.         :
#596407, NEW YORK POLICE
DEPARTMENT,                           :

            Defendants.               :
------------------------------------x

TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:


    Pro se plaintiff Tyrone Laster commenced this lawsuit on

August 17, 2007, in the Eastern District of New York, alleging that

his constitutional rights had been violated during his arrest on

September 26, 2006 by officers of the New York City Police

Department ("NYPD"). The case subsequently was transferred to this

district, as all defendants and a substantial part of the events

giving rise to the claims occurred in Bronx County. See Transfer

Order, Laster v. Mancini, No. 07-cv-3581 (E.D.N.Y. Aug. 29, 2007).

Plaintiff names as defendants three individual officers --

Detective Robert J. Mancini, Officer Douglas Vincent and Lieutenant

James Gribben -- and the NYPD, and asserts claims under 42 U.S.C §

1

1983 for false arrest, illegal entry, excessive force and failure to provide prompt medical assistance.

Defendants have moved for summary judgment, arguing principally that (1) plaintiff's claims for false arrest or unlawful detention are precluded by his conviction following the arrest; (2) plaintiff fails to state a claim for denial or delay of medical treatment; (3) plaintiff's excessive-force claim fails because his testimony is irreconcilable and he cannot establish that any of the defendant officers were involved in a violation of his constitutional rights; (4) the individual defendants are entitled to qualified immunity; (5) the NYPD is not an entity that may be sued; and (6) any remaining state-law claims should be dismissed for failure to comply with the notice-of-claim requirement of section 50-i of New York's General Municipal Law. (See generally Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem. of Law")). Plaintiff has submitted no response to the motion.

For the reasons that follow, we recommend that defendants' motion be granted in part and denied in part.

2

BACKGROUND

Plaintiff's allegations stem from his arrest on September 26, 2006 based on the complaint of his stepsister -- Ms. Jeanette Santos -- to officers at the NYPD's 43rd Precinct. She told the officers that plaintiff was in her apartment in possession of a gun and that she wanted him removed. (See Defs.' Rule 56.1 Stmt. ¶¶ 9-16; Decl. of Bradford C. Patrick in Supp. of Mot. for Summ. J. ("Patrick Decl.") Ex. D (Decl. of P.O. Vincent in Supp. of Mot. for Summ. J. ("Vincent Decl.")) ¶¶ 10-17; Patrick Decl. Ex. Q ("Santos Decl.") ¶ 2). A team of officers entered the apartment and arrested plaintiff, recovering a semi-automatic handgun from his pants pocket. (Patrick Decl. ¶ 52). Plaintiff was subsequently indicted and convicted under 18 U.S.C. § 922(g)(1) as a felon-in-possession, that is, for having possessed a loaded semi-automatic handgun in interstate commerce after having been convicted of: (i) attempted rape in 1998, (ii) attempted assault in 1995, and (iii) attempted robbery in 1982. (Patrick Decl. ¶¶ 92, 94).

A.    Facts and Prior Testimony[1]


Plaintiff arrived at Ms. Santos's apartment the night before his arrest, on September 25, 2006, at approximately nine p.m. (See Patrick Decl. Ex. Q (Santos Oct. 23, 2007 Trial Testimony Tr.) at 57). Ms. Santos testified at plaintiff's criminal trial that she had not permitted plaintiff to stay with her that night, but that he had come back the following morning. (Id.). She testified that in order to get him to leave, she told plaintiff that her ex-boyfriend was still living with her, an assertion that she admitted was not true. (Id. at 69).


According to Ms. Santos, plaintiff returned to her apartment at approximately 7:00 a.m. on September 26. She testified that he "didn't look like himself", and that he had a gun in his hand. (Id. at 57-59). Ms. Santos then left the house with her twelve-year-old son, locking the door behind her, and went to the 43rd Precinct. (Id. at 59-60). Officer Vincent, who was on duty on the morning of

---

[1] We rely here on testimony from plaintiff's criminal trial as well as declarations offered by the officers and Ms. Santos. Plaintiff's version of events, as reflected in his deposition testimony -- which defendants proffered as part of their motion -- differs substantially, and we present his side below, although we note that he did not oppose defendants' summary-judgment motion and thus offers no current opposition to their factual assertions.

September 26, was summoned to the precinct to meet with Ms. Santos. (Vincent Decl. ¶¶ 7-9; see also Patrick Decl. Ex. L (Vincent Trial Tr. 75)). He and defendant Lieutenant Gribben were both present when Ms. Santos made her complaint. (See Patrick Decl. Ex. E (Decl. of Lt. James Gribben in Supp. of Mot. for Summ. J. ("Gribben Decl.")) ¶¶ 6, 8). After hearing Ms. Santos's account, the officers decided to contact the Emergency Services Unit ("ESU") of the NYPD to undertake the operation to remove plaintiff from the apartment. (Vincent Decl. ¶¶ 21-22; Gribben Decl. ¶ 9; Vincent Trial Tr. 76). Ms. Santos gave the officers permission to enter her apartment and also gave them the key. (Santos Trial Tr. 60; Vincent Decl. ¶¶ 18-19). She indicated her consent to the entry by signing her name in Officer Vincent's memo book. (Vincent Decl. ¶ 19). Vincent testified that he had informed Ms. Santos that the police might need to use force to enter the apartment and that he believed that she understood. (Vincent Tr. 101-02).

Lieutenant Gribben proceeded to Ms. Santos's apartment building -- 1471 Watson Avenue -- and instructed officers to form a perimeter around the outside. (Gribben Decl. ¶ 11). Officer Vincent and his partner went into the building and surveyed the area outside Ms. Santos's apartment -- apartment 6D. (Vincent Decl. ¶ 23). Ms. Santos did not accompany the officers inside, but

5

instead remained a block away. (Santos Trial Tr. 67).

The ESU team then arrived, consisting of seven officers, including defendant Detective Robert Mancini, and the team proceeded to the hallway outside Ms. Santos's apartment. (Vincent Decl. ¶ 24-26; Bradford Decl. Ex. F (Mancini Decl.) ¶¶ 5, 11, 13). At this point Officer Vincent left the apartment building, and Lieutenant Gribben stayed in the interior hallway outside apartment 6D while the ESU officers went inside. (Vincent Decl. ¶ 28; Gribben Decl. ¶ 17).

The ESU officers entered apartment 6D and spread out to various locations within the apartment. (Mancini Decl. ¶¶ 16-17; see also Patrick Decl. Ex. M (Mancini Trial Tr.) 120). A radio transmission then alerted the officers that an individual was on the fire escape of the apartment. Two ESU officers went to the window where the fire escape was located and brought plaintiff back through the window. (Mancini Decl. ¶¶ 20-22; Mancini Trial Tr. 121). The two officers placed plaintiff face-down on the floor, and Detective Mancini and another officer then handcuffed him. (Mancini Decl. ¶¶ 22-23). Detective Mancini then frisked plaintiff and asked him if he had a weapon, to which, Mancini attests, plaintiff replied that he had a gun in his pants pocket. (Id. ¶¶ 37-39).

6

Detective Mancini searched plaintiff's right rear pants pocket and found a .25 caliber semi-automatic handgun. (Id. ¶ 40; Mancini Trial Tr. 122).

When the ESU officers indicated that all was secure, Lieutenant Gribben went inside the apartment and saw plaintiff already in handcuffs. (Gribben Decl. ¶¶ 17-20). Officer Vincent, after hearing the radio transmission that plaintiff was going out the window (Vincent Decl. ¶¶ 28-32), returned to the sixth floor and saw plaintiff being led out of apartment 6D in handcuffs; he did not see or participate in the apprehension of plaintiff. (Id. ¶¶ 34-37). Vincent then asked plaintiff "Are you sick? Are you injured", to which plaintiff responded "no". (Id. ¶¶ 40-41). Vincent then transported plaintiff to the 43rd Precinct, where he confirmed that plaintiff was wanted in connection with an armed robbery in Mississippi that had occurred on September 23, 2006. (Id. ¶¶ 45, 50).

Officer Vincent asserts that plaintiff never requested medical attention from him, that he was never informed that plaintiff needed or had requested such attention, and that he was not aware that plaintiff had been injured. (Id. ¶¶ 54-56). He further asserts that he did not observe or participate in the use of any force upon

7

plaintiff. (Id. ¶ 57).

Detective Mancini states that he had to pull plaintiff's left arm out from underneath his body before placing the handcuff on his wrist. (Mancini Decl. ¶ 31). He asserts that he did not strike plaintiff's head (id. ¶ 30), and that plaintiff did not complain, and he had no reason to believe, that he was squeezing plaintiff's hands too tightly or twisting them unnaturally while handcuffing him. (Id. ¶ 34). He also asserts that plaintiff did not request medical treatment from him and that he was never aware that plaintiff needed, or had asked for, such treatment. (Id. ¶¶ 47-48). He testified that the arresting officers had used the "minimal force necessary to take a person into custody" when arresting plaintiff. (Mancini Tr. 133).

B.   Plaintiff's Testimony

Plaintiff's version of the facts, which is included in defendants' motion papers in the form of his deposition transcript, differs substantially from that of the officers and Ms. Santos. He testified in his deposition that Ms. Santos had permitted him to stay overnight in her apartment on the night of September 25, 2006. (See Patrick Decl. Ex. G (Pl.'s Feb. 24, 2009 Dep. Tr.) ("Dep.

Tr.") at 27). He asserted that he had slept on the couch and had

not brought a gun to her apartment. (Id. at 27). He recounted that

Ms. Santos had left the apartment to take her son to school and

that he was asleep on the couch when the police entered the

apartment around 7:00 a.m. on September 26. (Id. at 28-29). He

testified that officers "kicked the door in with machine guns . .

. pointed at me." (Id. at 32-33). He stated that he then went

toward the window, contending that he never went out onto the fire

escape but rather stayed inside the apartment. (Id. at 33-34). He

did not remember how many officers had entered the apartment, just

that there were multiple officers and at least one machine gun.

(Id. at 35-36).


Plaintiff summarized the incident in his deposition as

follows:

> They entered the apartment. They slammed me on the floor
> and attempted to handcuff me and as they were handcuffing
> me, my hand was broken. All they kept shouting was
> ["]where's the gun, where's the gun.["] I said "what
> gun?" That's when my hand was broken like as they're
> saying you know where it's at and broke my hand in order
> to make me say where the gun was.

(Id. at 42).


Plaintiff further asserts that he did not resist being

handcuffed and that his hands were at his sides. (Id. at 43). He

alleges in essence that the officers broke his hand because he did not tell them where any gun was (id. at 45), and that when he told the officers that they had broken his hand, an officer replied "so what, you're going to jail". (Id. at 48-49). He also states that he was hit on the head at least twice. (Id. at 46-47). He denied in his deposition that the officers had found a gun on him. (Id. at 48).

Plaintiff asserts that he did request medical attention, testifying that he told the officers that he wanted to go to the hospital (id. at 49, 53), but that it was not until he was in the City correctional facility that medical staff there arranged for him to go to Bellevue Hospital's emergency room on September 28, 2006. (Id. at 49-50, 58). He described his hand as bruised with a large bump, and so swollen that it looked like "a boxing glove." (Id. at 59).

With respect to the individually named defendants, plaintiff testified that it was Mancini who handcuffed him and broke his hand, and that it was Vincent who knew that his hand was broken and did nothing to intervene or obtain medical treatment for him. Id. at 37-39, 67). He bases his accusations against the specific officers on the paperwork that he received in discovery. (Id. at

10

37-41). He asserts that Gribben was the supervising officer who was present and did nothing to intervene. (Id. at 68).

   C.   Medical Treatment

Plaintiff recounted that at Bellevue Hospital his hand was x-rayed and he was given pain medication and a splint, but that he was forced to surrender the splint at the correctional center. (Id. at 61-62). He was advised that he would need surgery in the form of a screw and two plates. (Id. at 62). He was also given Bacitracin for a wound on the back of his head. (Id. at 63).

The medical evidence in the record confirms that plaintiff was treated in the emergency room at Bellevue Hospital on September 28, 2006. (Patrick Decl. Ex. T ("Hosp. Records") at NYC 547). His hand was x-rayed that day, showing "a fracture of the base of the fifth metacarpal, with slight radial displacement of the distal fragment", and "associated soft tissue swelling overlying the fracture site". (Id. at NYC 551-52). The records also show that while initially the doctors thought that he needed surgery, upon further review they decided that such an operation was not necessary. (Id. at NYC 548).

11

Plaintiff asserted at his deposition that as a result of this incident, he still -- three years later -- had trouble using his injured hand, that it is his dominant hand, and that he wakes up in the middle of the night with pain in his hands. (Dep. Tr. 66). He also stated that he had developed anxiety problems about police officers and prisons. (Id. at 65).

D.   The Resulting Prosecution

On November 16, 2006,[2] a grand jury in the Southern District of New York indicted Laster for possession of a firearm in interstate commerce after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). (Patrick Decl. Ex. U (Indictment); see also Defs.' R.56.1 Stmt. ¶ 91). A superceding indictment was returned on January 25, 2007 to include 18 U.S.C. § 924(e)(1), which mandates the minimum custodial sentence allowed for persons convicted of § 922(g)(1). (Patrick Decl. Ex. V (Superceding Indictment); see also Defs.' R.56.1 Stmt. ¶ 92).

The court held a suppression hearing on June 6, 2007 to determine whether the gun or plaintiff's post-arrest admission to

---

[2] Plaintiff was indicted on a charge of armed robbery in the state of Mississippi on September 23, 2006. (Patrick Decl. Ex. H (Miss. Indictment).

12

possessing the gun should be suppressed. (See Patrick Decl. Ex. O ("Supp. Tr.") 3). Officer Vincent testified that Ms. Santos had described plaintiff as being menacing and "brandish[ing] a firearm", and that he appeared to be under the influence of drugs. (Id. at 5-6, 33). He stated that she also had told him that Laster was wanted for a crime in Mississippi and that he had a long criminal history. (Id. at 6). Ms. Santos told him that she was frightened and wanted Laster removed from her apartment. (Id. at 8-9). She described the gun to the officers and consented to a search of her apartment. (Id. at 9). Specifically, Vincent had her acknowledge in a signed writing that she consented to a forcible search. (Id. at 9-10).

Mancini also testified at the suppression hearing. He described going with the rest of the ESU team into the apartment and hearing a radio transmission that there was an individual on the fire escape. (Patrick Decl. Ex. P ("Mancini Supp. Tr.") 36). He testified that plaintiff was placed on the floor and handcuffed, and then frisked. According to Mancini, he then asked Laster if he had a weapon, and plaintiff replied that it was in his rear pocket. (Id. at 37). Mancini testified that the ESU officers had guns, including submachine guns, and that the officers still had their weapons drawn when plaintiff was handcuffed and searched. (Id. at

13

44-46). The gun that was recovered by Mancini was given to Vincent. (Vincent Supp. Tr. 19-20).

In an opinion dated June 26, 2007, the District Court denied the suppression motion in its entirety. The Court found that the officers' testimony was believable (Patrick Decl. Ex. R ("Supp. Op.") at 2-3) and that exigent circumstances had justified the police in not knocking and announcing their presence before entering the apartment. (Id. at 3). It further found that Laster's own testimony supported the officers' assertions that he had tried to flee through the window when they entered. (Id. at 3-4). The Court thus held that the entry and the protective search of plaintiff were justified. (Id. at 4).

A jury trial commenced before the Hon. John F. Keenan on October 23, 2007 and resulted in a verdict finding plaintiff guilty of violating 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e)(1). (See Defs.' R.56.1 Stmt. ¶ 94). On May 29, 2008, he was sentenced to seventeen years in prison, to be followed by five years of supervised release. (Patrick Decl. Ex. W). Laster appealed to the Second Circuit, which affirmed his conviction by order dated February 3, 2009. (Patrick Decl. Ex. X; Defs.' R.56.1 Stmt. ¶ 95).

14

On April 16, 2009 plaintiff pled guilty to the armed robbery charge in Mississippi. (Defs.' R.56.1 Stmt. ¶ 96).

D.   The Current Suit

Plaintiff filed suit here on August 17, 2007, while his criminal case was pending in this District. Defendants' motion for summary judgment was filed after completion of discovery.

ANALYSIS

We turn now to an analysis of defendants' current motion. Defendants move for summary judgment principally on the grounds that (1) plaintiff is precluded from asserting his claims for false arrest or illegal entry; (2) he fails to state a claim for denial or delay of medical treatment; (3) his excessive-force claim fails because his testimony is irreconcilable and because he cannot establish that any of the defendant officers were personally involved in a violation of his constitutional rights; (4) the individual defendants are entitled to qualified immunity; (5) the NYPD is not an entity that may be sued; and (6) any remaining state-law claims should be dismissed for failure to comply with the notice-of-claim requirement of section 50-i of New York's General

Municipal Law. We analyze the arguments roughly in the order in which they are asserted. We begin by discussing the standard applicable on a motion for summary judgment.

I.   Standard of Review

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade ex rel. Velez-Shade v. Hous. Auth. of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co.,

16

804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at

255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir.

2000).


The party moving for summary judgment bears the initial burden

of informing the court of the basis for his motion and identifying

those portions of the record, "including depositions, documents,

electronically stored information, affidavits or declarations,

stipulations . . . admissions, interrogatory answers, or other

materials" that demonstrate the absence of a genuine issue of

material fact. Fed. R. Civ. P. 56(c)(1); see, e.g., Celotex, 477

U.S. at 323; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d

Cir. 2002). If the non-moving party has the burden of proof on a

specific issue, the movant may satisfy his initial burden by

demonstrating the absence of evidence in support of an essential

element of the non-moving party's claim. See, e.g., Celotex, 477

U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101,

105 (2d Cir. 2002) (per curiam); Goenaga v. March of Dimes Birth

Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails

to meet his initial burden, however, the motion will fail even if

the opponent does not submit any evidentiary materials to establish

a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress

& Co., 398 U.S. 144, 160 (1970); Giannullo v. City of N.Y., 322

17

F.3d 139, 140-41 (2d Cir. 2003).

If the moving party carries his initial burden, the onus of demonstrating a genuine issue of material fact on any such challenged element of his claim then falls upon the opposing party. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam). In doing so, the opposing party may not rest "upon the mere allegations or denials of his pleading," Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 59-60 (2d Cir. 2004) (citation omitted), nor may he rely on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994).

In order to show a "genuine dispute" of material fact, the opposing party must demonstrate that there is sufficient evidence for a reasonable jury to find in his favor. Anderson, 477 U.S. at 248; Matsushita, 475 U.S. at 587; Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 455-56 (2d Cir. 2007) (citing Anderson, 477 U.S. at 249). Only if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact" will summary judgment be denied. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983)


II.   The False-Arrest/Unlawful-Entry Claim


In plaintiff's complaint, he alleges that he was arrested after "officers broke down the apartment door without an arrest or search warrant." (See Compl., Ex. C, at 4 ¶ IV). Because we read the complaints of pro se litigants liberally and derive from them the most reasonable claims and arguments that they may be read to imply, see, e.g., Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-76 (2d Cir. 2006) (per curiam), we construe this allegation to be a claim for false arrest or, in the alternative, unlawful entry.

19

Defendants argue that plaintiff's false-arrest claim is barred by his subsequent criminal conviction, and that plaintiff already litigated the lawfulness of the entry into the apartment in his criminal case and thus may not relitigate it here. (Defs.' Mem. of Law 3-7).

For the reasons that follow, we conclude that plaintiff's false-arrest claim is not barred by Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), but that it is meritless based on both his prior conviction and the evidence of record. We also find that although plaintiff is not precluded from raising the issue of the lawfulness of the entry into the apartment, this claim is meritless as well.

A.   False-Arrest Claim

1.   Legal Standards

A section 1983 claim for false arrest "is substantially the same as a claim for false arrest under New York law." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).[3] Under New York law, for a

---

[3] To the extent that plaintiff's complaint might be construed as encompassing a false-imprisonment claim it should be noted that the Second Circuit analyzes false-arrest and false-imprisonment claims identically. See, e.g., Jenkins v. City of New York, 478 F.3d 76, 88 n.10 (2d Cir. 2007) (citing 59 N.Y.

plaintiff to prevail on a false-arrest claim, he must demonstrate that (1) the defendant intentionally confined him, (2) the plaintiff was aware of being confined, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not justified or otherwise privileged. See, e.g., Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant, 101 F.3d at 852); Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)).

An arrest is justified or privileged if, inter alia, it is based on probable cause, which exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003) (quoting Weyant, 101 F.3d at 852); accord Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979) (quoting Brinegar v. United States, 338 U.S. 160, 175-176 (1949)). An arrest supported by probable cause cannot be the basis of a section 1983 claim for false arrest. See Boyd v. City of New York, 336 F.3d 72, 75-76 (2d

---

Jur.2d False Imprisonment § 1) ("False arrest is simply false imprisonment accomplished by means of an unlawful arrest."). This analysis is thus equally applicable to any such false-imprisonment claim.

Cir. 2003); <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 118 (2d Cir. 1995).

Probable cause exists where the objective facts known by the arresting officer at the time of arrest suggest that a person has committed some crime, even if not the crime invoked by the officer at the time of arrest. See <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004); <u>Jaegly v. Couch</u>, 439 F.3d 149, 153-54 (2d Cir. 2006). The focus with regard to probable cause is not on certitude by the arresting officer, but on the likelihood of some criminal activity. See <u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983) ("The process does not deal with hard certainties, but with probabilities."). Establishing probable cause requires a fact-based determination that considers the totality of the circumstances. See <u>id.</u> at 233; see also <u>United States v. Martin</u>, 426 F.3d 68, 74-76 (2d Cir. 2005). A law-enforcement official's basis for probable cause can be information about the commission of a crime received from another person, normally the putative victim or an eyewitness. <u>Martinez v. Simonetti</u>, 202 F.3d 625, 634 (2d Cir. 2000) (citing <u>Miloslavsky v AES Eng'g Soc'y</u>, 808 F. Supp 351, 355 (S.D.N.Y. 1992), <u>aff'd</u>, 993 F.2d 1534 (2d Cir. 1993)). Moreover, once an officer has probable cause to arrest a suspect, the officer need not investigate the suspect's claims of innocence prior to making the arrest. <u>Ricciuti</u>

22

v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (citing

Baker v. McCollan, 443 U.S. 137, 145-46 (1979); Krause v. Bennett,

887 F.2d 362, 372 (2d Cir. 1989)); see also Curley v. Village of

Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (citing Krause, 887 F.2d at

371-72). The existence of probable cause may be determined as a

matter of law absent dispute about either the pertinent events or

the knowledge of the arresting officers. Weyant, 101 F.3d at 852.


Of particular significance here, a conviction upon the charges

that arose from the arrest is deemed to be sufficient evidence that

probable cause existed at the time of the arrest. Thus, a claim for

false arrest may be entirely barred as a matter of law if the

plaintiff was subsequently convicted for the crime for which he was

arrested. See, e.g., McLaurin v. New Rochelle Police Officers, 439

Fed. App'x 38, 39 (2d Cir. 2011) (upholding grant of summary

judgment in favor of defendants with respect to section 1983 false-

arrest claims where "[plaintiff's] conviction established probable

cause for the arrest as a matter of law" (citing Cameron v.

Fogarty, 806 F.2d 380, 388-89 (2d Cir. 1989)); Hayes v. Cnty. of

Sullivan, 2012 WL 1129373, at *16 (S.D.N.Y. Mar. 30, 2012) (citing

cases, and finding that because plaintiff had pled guilty to the

criminal charges that arose from his arrest, he was "barred as a

matter of law from bringing a claim for false arrest under §

23

1983"); Green v. Gonzalez, 2010 WL 5094324, at *2 (S.D.N.Y. Nov. 22, 2010) ("A conviction of the plaintiff following arrest is viewed as establishing the existence of probable cause." (internal quotation marks and citation omitted)).

A plaintiff may recover damages on a claim for false arrest that resulted in a conviction, but to do so he must generally prove that his conviction has been invalidated, Heck, 512 U.S. at 486-87, and therefore a claim for false arrest relating to a conviction that has not been invalidated is usually not cognizable under section 1983. Id. at 487. The analysis is "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." Id. If it would, the claim must be dismissed. If, however, it would not necessarily demonstrate that the conviction is invalid, the claim may be pursued. Id. With respect to this latter category, the Heck Court noted that such a situation might arise due to doctrines such as "independent source" and "inevitable discovery", which could mean that the underlying conviction would not be invalidated by a successful false-arrest claim. Id. at 487 n.7. Put differently, "in a case where the *only* evidence for conviction was obtained pursuant to an arrest, recovery in a civil case based on false arrest would necessarily impugn any conviction resulting from use of that evidence."

24

Covington v. City of N.Y., 171 F.3d 117, 123 (2d Cir. 1999)
(emphasis in original).

    2.   Analysis

        a.   Heck v. Humphrey Bar

Defendants do not dispute the fact that the arresting officers had neither an arrest warrant for plaintiff nor a search warrant for the apartment. (See generally Defs.' Rule 56.1 Stmt.). Rather, they argue that because plaintiff has offered no proof that his conviction on the charge stemming from his arrest has been invalidated, he is barred from pursuing a false-arrest claim. (Defs.' Mem. of Law 3).

As noted, sometimes a conviction resulting from an arrest may be perfectly valid even though the arrest itself was invalid. See Covington, 171 F.3d at 123 (citing Washington v. Summerville, 127 F.3d 552, 556 (7th Cir. 1997)). It is in cases "where the *only* evidence for conviction was obtained pursuant to [the] arrest," id. (emphasis in original), or where a lawful arrest is an element of the crime, see Heck, 512 U.S. at 486 n.6, that a claim for false-arrest may not be pursued while the conviction stands.

Although we do not have the entire criminal trial transcript in this case, the record that we do have reflects that evidence obtained pursuant to plaintiff's arrest -- the recovered gun and plaintiff's statement about the gun -- was not the only evidence available to support a conviction for unlawful possession. Indeed, Ms. Santos testified at trial that plaintiff was in possession of a gun and was brandishing it in her presence. (See Santos Oct. 23, 2007 Trial Testimony Tr. 57-59; Supp. Tr. 5-6, 9). A successful false-arrest claim by plaintiff on the basis that the officers lacked probable cause would imply that the gun recovered from him upon his arrest, and his statement about the gun, should have been suppressed. Suppression of both the gun and plaintiff's statement, however, would not eliminate all of the evidence supporting his conviction of unlawful gun possession, and Ms. Santos' testimony would have been sufficient, as a legal matter, to support his conviction. Thus, such a result would *not* "necessarily imply the invalidity of his conviction." Heck, 512 U.S. at 487; but see Thompson v. N.Y. City Transit Police, 2012 WL 2792931, at *2 (E.D.N.Y. July 9, 2012) ("Suppressing the gun seized at the time of [plaintiff's] arrest would eliminate the only evidence supporting his conviction for unlawful gun possession; therefore, Heck bars his false arrest claim."). Accordingly, plaintiff's false-arrest claim is not barred as a matter of law by his conviction.

26

b.   Probable Cause

Even though plaintiff's claim is cognizable, we nonetheless find it to be meritless, because the officers plainly had probable cause to arrest him.

Probable cause is established when, taking all the circumstances into account, we can determine that the objective facts known to the arresting officer at the time of the arrest indicated that it was likely that some criminal activity had occurred. Probable cause "is a complete defense to an action for false[-]arrest," Weyant, 101 F.3d at 852 (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). The record here conclusively demonstrates that probable cause existed.

First, as discussed, the fact that plaintiff was subsequently convicted of unlawful gun possession is itself sufficient evidence that probable cause existed at the time of his arrest. See, e.g., McLaurin, 439 Fed. App'x at 39 (upholding grant of summary judgment in favor of defendants with respect to section 1983 false-arrest claims where "[plaintiff's] conviction established probable cause for the arrest as a matter of law" (citing Cameron, 806 F.2d at

27

388-89)); cf. Hayes, 2012 WL 1129373, at *16 ("When a Section 1983
plaintiff . . . pleads guilty to the underlying or a lesser charge,
th[is] fact[] *alone* provide[s] sufficient evidence that probable
cause existed at the time of the arrest and preclude[s] a false
arrest claim under Section 1983.") (modifications and emphasis in
original); Green, 2010 WL 5094324, at *2 ("A conviction of the
plaintiff following arrest is viewed as establishing the existence
of probable cause." (internal quotation marks and citation
omitted)). Since the officers arrested plaintiff because of the
complaint by Ms. Santos that he had a gun, and since plaintiff was
subsequently convicted on the charge of unlawful possession of a
firearm, we find that his conviction is sufficient proof that the
officers had probable cause to arrest him.

Second, the circumstances surrounding plaintiff's arrest give
rise to an independent finding that the officers had probable cause
to arrest him. In this case, Officer Vincent was assigned the role
of the arresting officer. (Vincent Decl. ¶ 48). Prior to
plaintiff's arrest, Vincent and Gribben met with Ms. Santos at the
43rd Precinct (see U.S. v. Laster Trial Tr. Vincent Direct, Ex. L,
at 75:6-13; Gribben Decl. ¶¶ 6, 8), and she informed them that
Laster was in her apartment and that his presence made her fear for
her safety. (Id. at 75:14-23). In Vincent's words, Ms. Santos

28

"basically said that [plaintiff] appeared to be under the influence
of some drug, that his behavior became progressively more bizarre
through the morning, and that he began brandishing, manipulating a
firearm." (U.S. v. Laster Mot. to Suppress Tr. Vincent Cross, Ex.
O, at 33:11-14). Because of the "description that Ms. Santos was
able to give regarding the events and her description of the
firearm," Vincent found her "extremely credible." (Trial Tr.
Vincent Direct, Ex. L, at 76:13-19). Additionally, Ms. Santos
informed Vincent that plaintiff might have been "wanted for a crime
in Mississippi and . . . that he had a long criminal history."
(Mot. to Suppress Tr. Vincent Cross, Ex. O, at 6:17-22). Although
plaintiff claims that he did not have a gun in Ms. Santos's
apartment (Dep. Tr. 28), that he did not tell her that he was
wanted for a crime in Mississippi (id. at 30), and that Ms. Santos
expressed no desire for him to leave (id. at 32), he does not
dispute that Ms. Santos actually made contrary statements to the
police.

Based on Ms. Santos' statements, it was objectively reasonable
for the officers to conclude that it was likely that some criminal
activity had occurred. We need not determine whether the officers
concluded that plaintiff was committing the federal offense of
being a felon in possession of a firearm, or that he had simply

29

menaced Ms. Santos, or that he had committed some other crime. Rather, we need only to determine that, based on the totality of the circumstances, the officers could have objectively concluded that plaintiff had likely committed *some* crime, and that, consequently, there was probable cause to arrest him. The complaint by Ms. Santos to the officers provided them with ample information to establish probable cause. See, e.g., Sewell v. City of N.Y., 2011 WL 1748733, at *3 (E.D.N.Y. May 9, 2011) (complaint by neighbor to police that plaintiff had pointed a handgun at him was sufficient to establish probable cause for arrest).

Because plaintiff's subsequent conviction warrants a finding of sufficient probable cause, and because the undisputed facts in the record support a finding of probable cause, we conclude that plaintiff's false-arrest claim fails as a matter of law, and we therefore recommend that it be dismissed.

C. The Illegal-Entry Claim

Plaintiff alleges that he was arrested after "officers broke down the apartment door without an arrest or search warrant." (See Compl. ¶ IV). Defendants assert that the issue of illegal entry was already litigated and decided in the federal criminal proceeding that resulted from plaintiff's arrest. (See Defs.' Mem. of Law 5).

We conclude that plaintiff's claim is not barred by collateral estoppel, but we find it to be meritless.

The preclusive effect of a federal judgment is determined by federal law. See Barnes v. Pozzi, 2012 WL 3155073, at *6 (S.D.N.Y. Aug. 3, 2012) (citing Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002)). The doctrine of collateral estoppel "bars a party from relitigating in a subsequent proceeding an issue of fact or law that was clearly raised in a prior action where the party to be precluded . . . had a full and fair opportunity to litigate the issue, and a decision on that issue was necessary to support a valid and final judgment on the merits." Giantasio v. D'Agostino, at *3 (S.D.N.Y. May 22, 2012) (quoting Envtl. Def. v. U.S. Envtl. Prot. Agency, 369 F.3d 193, 202 (2d Cir. 2004)). The party against whom the bar is asserted has the burden of demonstrating that there was an absence of a full and fair opportunity to litigate the issue. See Rahman v. Acevedo, 2011 WL 6028212, at *5 (S.D.N.Y. Dec. 5, 2011). The doctrine has been consistently applied to bar relitigation of Fourth Amendment claims in Section 1983 actions. See, e.g., Hayes, 2012 WL 1129373, at *15 (citing cases).[4]

---

[4] Hayes applies the doctrine to a state-court judgment, but the analysis would be the same for plaintiff's federal conviction here. See Postlewaite v. McGraw-Hill, Inc., 333 F.3d 42, 47-48

31

In this case, Laster clearly raised the issue of unlawful entry in his defense to the firearm prosecution. (See generally Supp. Order). Specifically, he made a motion to suppress the gun on the basis that the search and seizure was unlawful, as well as a motion to suppress the statement about the gun that he allegedly made to the officers. (See, e.g., Vincent Supp. Tr. at 3).

He also had a full and fair opportunity to litigate the issue. The court held a suppression hearing at which it heard testimony from Officer Vincent and Detective Mancini, and defense counsel was given the opportunity to cross-examine them. The court then issued a written opinion denying both motions. It found that the entry into the apartment was lawful, as Ms. Santos had given her consent and exigent circumstances did not require the officers to knock, and that the question put to plaintiff regarding the whereabouts of the gun was proper under the "public safety" exception to the Miranda warning requirements. (Supp. Op. at 3-5). Laster appealed his conviction but did not choose to appeal the ruling regarding the lawfulness of the officers' entry. (See Ex. X (USCA Mandate (2d Cir. Feb. 27, 2009))). He therefore had a full and fair opportunity to litigate the issue of the lawfulness of the entry. See, e.g., Hayes, 2012 WL 1129373, at *14-16 (plaintiff afforded full and fair

(2d Cir. 2003).

opportunity to litigate issue of probable cause where state trial
court held a suppression hearing at which officers were cross-
examined, the trial court issued a written decision denying the
motion to suppress, and plaintiff pled guilty); cf. Reyes v. City
of N.Y., 2012 WL 37544, at *4 (E.D.N.Y. Jan. 9, 2012) (plaintiff
afforded a full and fair opportunity to litigate issue in state
court where a hearing was held and the judge issued a written
memorandum and order finding that the officers had probable cause
to arrest plaintiff); Mitchell v. Hartnett, 262 F. Supp.2d 153, 155
(S.D.N.Y. 2003) (plaintiff precluded from re-litigating issue of
lawfulness of his arrest in § 1983 action where the issue had been
the subject of a suppression hearing before the trial court).

    As for the last element of collateral estoppel, the trial
court decided the issue of the lawfulness of the entry (see Supp.
Op. at 5), but we cannot say that that decision was necessary to
support the final judgment of conviction. As we have noted, even if
the gun and Laster's statements were suppressed, it was possible
for the State to have obtained a conviction for unlawful gun
possession based on the testimony of Ms. Santos. Since the
suppression decision by the trial court was not a final judgment
and since it cannot be said to have been "essential" to the
judgment, Wilson v. Steinhoff, 718 F.2d 550, 552 (2d Cir. 1983)

33

(rejecting collateral-estoppel effect on civil challenge to denial of suppression since plaintiff pled guilty); see also Johnson v. Watkins, 101 F.3d 792, 795-96 (2d Cir. 1996); Crespo v. New York City Police Comm'r, 930 F. Supp. 109, 115 (S.D.N.Y. 1996), we find that plaintiff is not precluded here from raising again the issue of unlawful entry.

We nonetheless find plaintiff's claim of unlawful entry to be meritless. Simply stated, the entry of the officers into the apartment was reasonable based on the consent of Ms. Santos.

A warrantless search is per se unreasonable under the Fourth Amendment unless it falls within certain exceptions. One such exception is where the search is undertaken pursuant to the consent of an authorized party. See United States v. Lewis, 386 F.3d 475, 481 (2d Cir. 2004); see also Georgia v. Randolph, 547 U.S. 103, 109 (2006) (discussing consent exception); United States v. Matlock, 415 U.S. 164, 169-72 (1974) (same); United States v. Pabon, 603 F. Supp.2d 406, 412 (N.D.N.Y. 2009) ("So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." (quoting United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995)). Where consent is given, neither a warrant nor probable cause is required to justify the search. Rather, the

prosecution need only prove by a preponderance of the evidence that consent was voluntarily given. Lewis, 386 F.3d at 481.  There is no dispute as to the fact that Ms. Santos consented to a police search of her apartment with the goal of removing plaintiff from the premises. She in fact asked the officers to remove him and provided her consent to entry in writing at the time of her complaint (see Ex. D, Ex. 1 (Vincent Memo Book)), and she later affirmed that consent by affidavit in Laster's criminal case. (See Ex. Q). We therefore find that Ms. Santos voluntarily consented to the search, and that therefore the officers' subsequent entry and search of her apartment did not violate plaintiff's Fourth Amendment rights. See, e.g., Lewis, 386 F.3d at 481 (warrantless search of defendant's bedroom not unreasonable where his mother had given consent to the search); United States v. Soto-Teran, 44 F. Supp.2d 185, 193-94 (E.D.N.Y. 1996) (where resident of apartment gave consent to search, subsequent seizure of contents of defendant's briefcase did not violate her Fourth Amendment rights).

Furthermore, a warrantless entry may also be justified where "exigent circumstances demand that law enforcement agents act without delay." United States v. Stokes, 2012 WL 752078, at *4 (S.D.N.Y. Mar. 7, 2012) (quoting United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990)); see also United States v. Mendoza,

406 Fed. App'x 513, 514-15 (2d Cir. 2011). The test for determining the existence of exigent circumstances is an objective one based upon an examination of the totality of the circumstances. Factors to be considered include

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

Stokes, at *4 (quoting MacDonald, 916 F.2d at 769-70). The "essential question" is "whether law enforcement agents were confronted by an 'urgent need' to render aid or take action", as in situations involving a threat of bodily harm. Id. (citations omitted).

In this case, the police were informed by Ms. Santos that plaintiff was in her apartment in possession of a firearm, that he had a criminal history, and that he appeared to be "not himself". This account weighs strongly in favor of a finding of exigent circumstances. The officers clearly had reason to believe that plaintiff had a criminal history, was armed, was inside Ms. Santos's apartment, and was acting bizarrely. Such circumstances

36

are sufficient to warrant a finding that there was an "urgent need" to take action, and thus a finding that exigent circumstances justified the warrantless entry in this case. Cf. Pierce v. Ottoway, 2009 WL 749862, at *8 (W.D.N.Y. Mar. 18, 2009) (even assuming officers had forced their way into plaintiff's home without his consent, exigent circumstances justified their entry since they had received reports that he was a convicted felon and was discharging firearms on his property).

In sum, we find that plaintiff's false-arrest claim is not barred as a matter of law, but that it is meritless, as the officers had probable cause to arrest him. We further find that plaintiff's unlawful-entry claim is not barred because the suppression decision was not "essential" to the final judgment of conviction, but this claim is also meritless. We therefore recommend that defendants' motion for summary judgment on these claims be granted and that they be dismissed.

II.   The Denial-of-Medical-Treatment Claim

Plaintiff claims that he suffered injuries as a result of the arrest and that he was denied medical treatment. (Compl. ¶ IV, V; see also, e.g., Dep. Tr. 49, 53). Defendants argue first that

37

plaintiff fails to plead a claim for delay or denial of medical treatment because he fails to allege any facts putting defendants on notice of a claim involving deliberate indifference to his medical needs, and second, that the claim fails as a matter of law because the alleged injury was not sufficiently serious. (See Defs.' Mem. of Law 7-10).

We understand defendants' first argument to be essentially that, under Rules 8(a) and 12(b)(6), plaintiff fails to state a claim, and their second argument to be that, regardless of whether plaintiff's complaint passes pleading muster, any deprivation was not "sufficiently serious" to rise to the level of a constitutional violation. Because we find defendants' first argument to substantially similar to the second, we address both by analyzing plaintiff's allegations and the evidence in the record in light of the standards for finding an Eighth Amendment violation.

A.   Eighth Amendment Criteria

The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citing Farmer v. Brennan,

511 U.S. 825, 832, 844 (1994)).[5] To establish a constitutional claim based on the quality of medical care provided by a defendant, a plaintiff who is in custody must demonstrate "deliberate indifference to [his] serious medical needs." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)) (alteration in original).

This two-part test embodies both an objective and a subjective component. First, as an objective matter, "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Salahuddin, 467 F.3d at 279 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Id. (quoting Wilson, 501 U.S. at 298) (internal quotation marks omitted). This objective inquiry itself may be split into two parts. First, the court asks "whether the prisoner was actually deprived of adequate medical care." If so, the court next considers "whether the inadequacy in

_____

[5] While at the time of the incident in question, Laster was a pre-trial detainee and not a convicted prisoner, the standards governing deliberate indifference to the medical needs of persons in custody are the same. See Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").

medical care is sufficiently serious." Id. at 279-80. "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Id. (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003))(internal quotation marks and brackets omitted). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." Smith, 316 F.3d at 187.

The second, subjective component of an Eighth Amendment claim requires us to ask whether the failure to render proper care resulted from "a sufficiently culpable state of mind." Id. (citing Wilson, 501 U.S. at 300). This state of mind must reflect "deliberate indifference to inmate health, . . . a mental state equivalent to subjective recklessness, as the term is used in criminal law." Id. (citing Farmer, 511 U.S. at 839-40). Disagreement with a course of treatment chosen by a medical

40

provider does not suffice to demonstrate such indifference. See, e.g., Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998); Sonds v. St. Barnabas Hosp. Corr. Health Serv., 151 F. Supp.2d 303, 312 (S.D.N.Y. 2001). Indeed, even negligence tantamount to medical malpractice does not amount to an Eighth Amendment violation. Estelle, 429 U.S. at 105-06; Chance, 143 F.3d at 703. To be held in violation of the Eighth Amendment, the charged official must "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280 (citing Farmer, 511 U.S. at 836-37).


   B.   Evaluation of the Claim


   Plaintiff states that a bone in his hand just below his pinky finger was broken during his arrest. (Compl. ¶ IV(A)). He asserts that he requested medical attention from the arresting officers, specifically Officer Vincent, testifying that he told the officer that his hand was broken and that he wanted to go to the hospital. (Dep. Tr. at 49, 50, 53). He states that Officer Vincent refused to take him to the hospital and did nothing to get him medical attention. (Id. at 67). It was not until he was in the City correctional facility that medical staff there arranged for him to go to Bellevue Hospital's emergency room on September 28, 2006.

41

(Id. at 49-50, 58). He described his hand as bruised with a large bump, and so swollen that it looked like "a boxing glove." (Id. at 59). He recounts that he saw a hand specialist at Bellevue Hospital, where his hand was x-rayed five times, and he was told that "a metal plate with the support of two screws had to be inserted" in his hand "in order to hold the bones together for healing purposes." (Id.). He received pain medication and a "substitute splint for the metal plates." (Id.). He states that the surgery was never done "because federal marshal[]s took [him] to the" Manhattan Correctional Complex. (Id.). In his deposition testimony, he further states that now he has "problems using [his] right hand" and "wake[s] up in the middle of the night with pains in [his] hand[]." (Id. at 66.).

Defendants argue that such a deprivation does not constitute a sufficiently serious injury, and that plaintiff has not alleged any facts giving rise to an inference of deliberate indifference on the part of any of the defendants. We disagree in part with this analysis.

In substance, plaintiff presses two complaints about his medical treatment. First, he asserts that he asked for medical help at the time of his arrest because of the pain in his broken hand,

42

and that the officers, notably Officer Vincent, refused to allow it, choosing instead to take him to the precinct and then to Central Booking for processing. As a result, he asserts, his treatment, including pain relief, was delayed, apparently for two days. Second, he seems to take issue with the fact that his treating doctors ultimately decided that surgery was unnecessary. We first address plaintiff's delay-in-treatment claim.

With respect to the first part of the deliberate-indifference inquiry, we cannot say as a matter of law that a broken hand, with attendant pain, does not constitute a sufficiently serious injury for Eighth Amendment purposes. See, e.g., Benning v. Ehrits, 2009 WL 2982973, at *4 (N.D.N.Y. Sept. 14, 2009) (citing Bryan v. Endell, 141 F.3d 1290, 1293 (8th Cir. 1998) (finding a broken hand a serious medical condition)); Mendez v. Acting Sheriff, Nassau Ctny. Corr. Ctr., 2010 WL 2629781, at *2 (E.D.N.Y. June 28, 2010) (citing same). The objective inquiry, however, focuses not just on the level of injury but on the denial or delay of care, and the medical consequences that flow from the alleged denial of care are "highly relevant". Smith, 316 F.3d at 187. Plaintiff reports that he was not taken to Bellevue Hospital until two days after his arrest, where he received x-rays and pain medication, that he was taken for follow-up visits, and that he saw a hand specialist.

43

(Compl. ¶ IV(A); Dep. Tr. 50, 58-59, 60-61). He goes on to allege that he now has trouble using his right hand and still suffers from residual pain. (Dep. Tr. 66).

While it is undisputed that a two-day delay occurred between plaintiff breaking his hand and first receiving treatment, nothing in the record suggests that this delay caused whatever long-term damage about which plaintiff complains. Nevertheless, there remain the questions of whether the two-day delay in care for a broken hand, during which he assertedly suffered significant pain, was sufficiently serious to satisfy the objective inquiry, and, if so, whether any of the named defendants may be held responsible for that delay.

There is no dispute that plaintiff sustained a broken hand, and drawing all inferences in the light most favorable to the non-moving party, we assume the truth of plaintiff's allegations that he suffered and continues to suffer substantial pain as a result of that injury. Severe pain can itself constitute a serious medical need for Eighth Amendment purposes. McMillon v. Davidson, 2012 WL 2711011, at *2 (W.D.N.Y. July 9, 2012) (citing cases); accord Brock v. Wright, 315 F.3d 158, 163 (2d Cir. 2003) ("[W]e have long held that the Eighth Amendment forbids not only deprivations of medical

44

care that produce physical torture and lingering death but also less serious denials which cause or perpetuate pain."); Chance, 143 F.3d at 702 (listing factors to be considered in determining whether a serious medical need exists, including "the existence of chronic and substantial pain") (citations omitted).

Moreover, "an intentional delay in necessary medical care, amounting in effect to a form of punishment, is actionable." Arnold v. Westchester Cty., 2012 WL 336129, at *13 (S.D.N.Y. Feb. 3, 2012) (citing Thomas v. Tisch, 2009 WL 701009, at *8 (E.D.N.Y., Mar. 11, 2009)). Courts have declined to dismiss deliberate-indifference claims as a matter of law where plaintiffs have alleged a delay in medical treatment causing substantial pain, even when the injuries alleged were not life-threatening and the delay was relatively brief. See, e.g., Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) (reversing lower court's summary judgment order on the ground that plaintiff's allegations demonstrated the possibility that defendants had intentionally delayed medical care for five hours while knowing that plaintiff was in "extreme pain"); Thomas, 2009 WL 701009, at *7 (declining to conclude as a matter of law that a delay of treatment and medication for twenty hours cannot plausibly rise to the level of deliberate indifference); Lasher v. City of Schenectady, 2004 WL 1732006, at *5 (N.D.N.Y. Aug. 3, 2004)

45

("Delays in treating painful medical conditions that are not life threatening can support Eighth Amendment claims."); Davidson v. Harris, 960 F. Supp. 644, 648 (W.D.N.Y. 1997) ("under certain circumstances a five- or six-hour delay in medical care can constitute deliberate indifference, [but that such] a conclusion is highly fact-sensitive."); Todaro v. Ward, 431 F. Supp. 1129, 1132 (S.D.N.Y 1997) ("there are those cases which have held unconstitutional denied or unreasonably delayed access to a physician for diagnosis and treatment of physical conditions which, although not life-threatening or likely to result in permanent disability, cause discomfort").

In contrast, a number of courts, when confronted with delays of one day or less, have found no Eighth Amendment violation, emphasizing the brevity of the delay because it undercut the assertion that defendants were deliberately indifferent, that is, that the circumstances suggested a failure to meet at least the subjective standard for Eighth Amendment liability. See, e.g., Tatum v. City of New York, 2009 WL 124881, at *6 (S.D.N.Y. Jan. 20, 2009) (concluding, on summary judgment, that a delay of ten to twenty minutes cannot constitute deliberate indifference as a matter of law); Revenell v. Vall Per Steeq, 2007 WL 765716, at *4 (S.D.N.Y. Mar. 14, 2007) (holding at summary judgment stage that

46

fifteen to twenty minute delay in treatment of fractured finger could not amount to deliberate indifference); Rodriquez v. Mercado, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (because plaintiff did not allege that he experienced extreme pain that more rapid treatment would have alleviated, and because he was seen within eight or nine hours of the incident by a nurse who prescribed him pain medication, this was not sufficient to state an Eighth Amendment claim); Palacio v. Ocasio, 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006) (finding at summary judgment level that where delay in treatment was at most a little more than two hours and nothing in the record suggested that plaintiff suffered from a life-threatening or fast-degenerating condition or that prison officials deliberately delayed his treatment as a form of punishment, delay did not rise to level of deliberate indifference). See also Thomas, 2009 WL 701009, at *8 (citing cases).

To similar effect, some courts in this district have held that delays in treatment relating to a broken hand or finger do not constitute deliberate indifference to medical needs, as long as the plaintiff was given a preliminary examination and at least some treatment the day of the injury or the day following. See, e.g., Jones v. Mack, 2012 WL 386269, at *6 (S.D.N.Y. Feb. 3, 2012)

47

(eight-day delay before setting broken hand not sufficiently serious where plaintiff was seen by a doctor and given pain medication the day following the injury); Henderson v. Doe, 1999 WL 378333, at *3 (S.D.N.Y. Sept. 28, 1999); (failure to see specialist for broken finger not sufficiently serious where plaintiff was examined the day of the injury and given an x-ray, splint, and pain medication); Ruiz v. Homeringhouse, 2003 WL 21382896, at *4 (W.D.N.Y. Feb. 13, 2003) (no violation where plaintiff was taken to the emergency room the day he broke his hand and given a splint and pain medication); Rodriquez v. Ames, 224 F. Supp.2d 555, 563 (W.D.N.Y. 2002) (15-day delay in receiving x-ray for fractured hand not sufficiently serious where plaintiff was seen by a nurse on the day of the injury).

In this case, plaintiff was not seen by medical personnel nor was he given pain medication for his broken hand, until two days after the injury, during which time he allegedly suffered severe pain. This delay in care, coupled with plaintiff's alleged pain, are sufficient to permit a trier of fact to determine that plaintiff's injury was serious enough to satisfy the objective inquiry. See, e.g., Archer, 733 F.2d at 16; Thomas, 2009 WL 701009, at *7.

Assuming that there was a deprivation of medical care for plaintiff's hand injury that was sufficiently serious under the deliberate-indifference standard, plaintiff must also satisfy the second prong of the inquiry. To do so, he must show both that "the official [was] . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that he . . . [drew] that inference." Bennett v. Vaccaro, 2011 WL 1900185, at *9 (S.D.N.Y. Apr. 11, 2011) (quoting Farmer, 511 U.S. at 837). In this case, defendants have proffered evidence that they were not aware that plaintiff needed medical attention or that he had requested such attention. Officer Vincent states that he asked plaintiff if he was sick or injured and that plaintiff responded that he was not. (See Vincent Decl. ¶¶ 40-41). The officer further affirms that on the date of the incident plaintiff did not request medical attention from him, he was never informed that plaintiff had required or requested medical attention, and he was never informed that plaintiff had been injured. (Id. ¶¶ 54-56). Lieutenant Gribben also attests that plaintiff "did not appear to be injured" and that "[n]o individual informed [Gribben] that plaintiff had been injured during his arrest." (Gribben Decl. ¶¶ 28-29). Mancini similarly submitted a declaration stating that plaintiff did not request medical treatment from him and that he was never aware that plaintiff had requested or was in need of any

49

medical treatment. (Mancini Decl. ¶¶ 47-48).


Though plaintiff has submitted no further evidence refuting defendants' version of the facts, defendants have incorporated plaintiff's deposition testimony as part of the record in their motion for summary judgment. Therefore, we can use this testimony to determine whether a factual dispute exists concerning defendants' awareness that plaintiff was injured and required immediate medical care at the time of his arrest. See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement."); Wali v. One Source Co., 678 F. Supp.2d 170, 178 (S.D.N.Y. 2009) ("[W]here a pro se plaintiff fails to submit a proper [opposing statement] . . . the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions.") (citations omitted).


In plaintiff's deposition testimony, he states that at the time of the incident he said "my hand is broken, you broke my hands", and asserts that he requested medical attention. (Dep. Tr.

49, 51). Plaintiff states that Officer Vincent "knew that [plaintiff's] hand was broken and he knew who broke [plaintiff's] hand and he did nothing to intervene or . . . get [plaintiff] medical attention." (Id. at 67). He states that he asked for medical attention "on the way down in the elevator" immediately following his arrest, (id. at 50), and that Vincent "was aware [he] was in pain and did nothing about it." (Id. at 67). Moreover, he describes his hand as so bruised and swollen at that point that any accompanying officers should have been aware that his plea for help was justified. (Id. at 59).

Even assuming that Officer Vincent was aware that plaintiff was seriously injured and did nothing, it is not clear whether the officer was personally responsible for denying plaintiff immediate medical care. However, the record before us leaves the question open, and indeed Vincent's own testimony to the effect that he asked Laster whether he needed medical attention raises at least a permissible inference that he had the ability to arrange for such care if he decided that it was warranted. In the end, this is a question for the factfinder. See, e.g., Weyant, 101 F.3d at 857 (finding summary judgment inappropriate where a reasonable jury could have inferred that defendant police officer was aware of plaintiff's serious medical condition and disregarded it, despite

51

the fact that defendant had no supervisory capacity and was not personally responsible for providing plaintiff with medical care).

Plaintiff also complains about the failure to provide surgery for his injury. According to plaintiff, when he was taken to the City Corrections Department, he told an unidentified lieutenant of his injury, and at that point medical staff looked at his hand. (Id. at 49-50, 58). He was then taken to Bellevue Hospital on September 28, 2006. (Id. at 50, 58-59). At Bellevue he was told that a bone was broken in his hand below the wrist and above the pinky finger. (Id. at 60). He reiterates that the doctors initially thought that he would require surgery, but that when he went back, "they said it looked like it had healed or was starting to heal." (Id. at 60-61). He further testified that he was taken to Bellevue three or four times, that he was given Motrin or Tylenol 3, and that he was given a splint but it was taken away from him in custody. (Id. at 60-61).

Plaintiff's apparent complaint that he was denied surgery fails, if for no other reason, because he did not sue the doctors who were apparently responsible for the decision not to operate. In any event, "[a] difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law,

52

constitute deliberate indifference." Sonds, 151 F. Supp.2d at 311 (citations omitted). "[T]he fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred", does not give rise to a constitutional violation. Id. (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1995)).

It is undisputed that plaintiff was given medical treatment, including x-rays and follow-up visits, and that plaintiff did not receive surgery as a result of the medical findings of his treating doctors. As noted, to demonstrate deliberate indifference requires a showing of a mental state equivalent to recklessness; disagreement with a course of treatment does not suffice, see, e.g., Sonds, 151 F. Supp.2d at 312, and even negligence rising to the level of medical malpractice does not amount to an Eighth Amendment violation. Estelle, 429 U.S. at 105-06. The doctors made the ultimate determination to forego surgery because, according to plaintiff, "they said it looked like it had healed or was starting to heal." (Dep. Tr. 60-61). That was a medical decision, which plaintiff cannot challenge in a section 1983 lawsuit based solely on his unhappiness with the doctors' assessment.

53

In sum, we find that defendants have failed their initial burden to show the absence of a factual dispute regarding plaintiff's deliberate-indifference claim as to defendant Vincent. Viewed in the light most favorable to the non-moving party, plaintiff, through his deposition testimony, has plausibly alleged that he informed Vincent about his broken hand and that Vincent was deliberately indifferent to his need for immediate medical care. The fact, undisputed by both parties, that plaintiff's hand was broken during the incident offers more credibility to plaintiff's contention that he told the officers that he was hurt and that they were aware of his request for medical attention.  Whether Vincent was responsible for the delay in medical care, whether the delay contributed in any way to a serious medical condition, and whether Vincent possessed the requisite subjective state of mind to constitute deliberate indifference, are factual disputes reserved for the jury. As to defendant Vincent, we recommend that summary judgment on plaintiff's medical-care claim be denied.

However, plaintiff cannot sustain his burden of demonstrating that defendants Gribben or Mancini acted with deliberate indifference to a serious medical need. Plaintiff has not alleged in any part of the record that Gribben was aware of his broken hand and his need for immediate medical care. Moreover, plaintiff never

specifically states that he asked Mancini for medical attention or that Mancini was aware that he was hurt. We therefore recommend that plaintiff's claim for delay or denial of medical care be dismissed as to defendants Gribben and Mancini for lack of proof on an essential element of the claim.

### III. The Excessive-Force Claim

Plaintiff also articulates a claim for the use of excessive force during his arrest. He alleges in his complaint that during his arrest, the officers "used deadly force . . . by wrenching [his] hands with a vengeful twist while [his] hands were cuffed behind [his] back" and that this resulted in his hand being broken. (Compl. ¶ IV). He further alleges that he was "shoved to the ground and punched in [the] face while [the] supervisor looked on." (Id.).

Defendants argue that plaintiff's claim must be dismissed because his deposition testimony is inconsistent with the allegations in his complaint. As a second argument, they assert that his claim must fail because he cannot establish the personal involvement of any of the defendants in a constitutional violation. (See Defs.' Mem. of Law 11-24). For the reasons that follow, we find that the inconsistencies between plaintiff's allegations and

55

his testimony are not sufficient to reject his testimony on summary judgment, and that plaintiff has put forward sufficient evidence of personal involvement by defendants Mancini and Gribben.

A.   Legal Standard

A claim for the use of excessive force during an arrest arises under the Fourth Amendment and is analyzed under a standard of objective reasonableness. See Graham v. Connor, 490 U.S. 386, 397 (1989); see also Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003) ("It is well established that 'use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.'" (quoting Saucier v. Katz, 533 U.S. 194, 201-02 (2001))). In applying this test, the trier of fact must look to whether, in light of the circumstances confronting the officer, the amount and nature of the force used was "objectively reasonable". Graham, 490 U.S. at 397; Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002). As emphasized by the Supreme Court, "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (citations omitted);

56

accord, e.g., Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995).
The analysis requires "consideration of the specific facts in each
case, including the severity of the crime at issue, whether the
suspect posed an immediate threat to the safety of others and
whether he is actively resisting arrest." Sullivan v. Gagnier, 225
F.3d 161, 165 (2d Cir. 2000). "If the force used was unreasonable
and excessive, the plaintiff may recover even if the injuries
inflicted were not permanent or severe." Robison v. Via, 821 F.2d
913, 924 (2d Cir. 1987); see also Maxwell v. City of N.Y., 380 F.2d
106, 108-10 (2d Cir. 2004).

        B.   Analysis


    Defendants do not specifically address the reasonableness of
the force used in this case. Rather, they argue that the court may
rule on plaintiff's credibility and that it "should disregard
plaintiff's contradictory sworn statements" as being insufficient
to raise a genuine issue of material fact sufficient to withstand
summary judgment. (See Defs.' Mem. of Law 11-13).


    Defendants rely on Jeffreys v. City of N.Y., 426 F.3d 549 (2d
Cir. 2005), for the proposition that a court may "make assessments
about whether a reasonable jury could credit a plaintiff's

57

testimony" (Defs.' Mem. of Law 13 (quoting Jeffreys)), and that summary judgment may be proper where a plaintiff's testimony is "unsubstantiated by other direct evidence . . . [and is] 'so replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the plaintiff's complaint." (Defs.' Mem. of Law 13 (quoting Jeffreys)). The panel in Jeffreys upheld a district court decision granting summary judgment where the district court had found "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and . . . even after drawing all inferences in the light most favorable to the plaintiff, determined that 'no reasonable person would undertake the suspension of disbelief necessary to credit the allegations made in [the] complaint.'" Jeffreys, 426 F.3d at 555 (citation omitted). However, the court also noted that even if much of a plaintiff's testimony is contradictory and incomplete, and a court must make some assessment of the plaintiff's account of the facts, "the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." Id. at 554.

58

Jeffreys does not support defendants' argument. In Jeffreys, the Second Circuit affirmed the grant of summary judgment against a plaintiff who had alleged that, while unlawfully present in a school building, he had been severely beaten and thrown out of a third-floor window by a group of police officers. Id. at 551. A deciding factor for the Court in finding that the plaintiff's testimony was so inconsistent that no reasonable jury could credit his version of the facts was that on three separate occasions, within hours or days after the incident, Jeffreys had admitted (to medical personnel, to a sergeant and to prison screening personnel) that he had in fact jumped or run out of a window, and that he had injured himself and made no mention of being attacked by police. Id. at 552. In addition, the panel noted that during Jeffreys' prosecution, he never suggested that he had been assaulted by the police. Id. Moreover, the Court pointed out that the contemporaneous medical records were inconsistent with his claim that he had been beaten about the head by police. Id. at 552-53.

In this case, none of the salient factors cited in Jeffreys are present. Rather, defendants point to several minor inconsistencies between plaintiff's testimony and his prior pleading. First, they quote his complaint, in which he alleges that his hands were twisted while he was being handcuffed and that he

59

was then shoved to the ground and punched in the face. (Defs.' Mem. at 11-12). Next, they recount plaintiff's deposition testimony that his hand was twisted prior to being handcuffed, that he was shoved to the ground before the handcuffing, and that he was hit in the back of the head while on the ground. (Id. at 12). As a third version, they point to plaintiff's medical records, recounting that he told a treating physician that his hand had been stepped on. (Id.).

We decline to view these inconsistencies as irreconcilable to the point of deeming plaintiff to be incredible as a matter of law, as defendants urge. While plaintiff's testimonial account of the facts differs slightly from his complaint, we can surmise that plaintiff's arrest happened rather quickly, and in such a situation it may be difficult for him to know or remember in what order he was hit, shoved and handcuffed, and whether he was punched in the face or another part of his head. With respect to plaintiff's statement that his hand was stepped on, although this is clearly inconsistent with twisting, it is not so out of the boundary of possible events as to lead us to conclude that plaintiff's testimony must be discounted. Moreover, there is no dispute that plaintiff's hand was broken during the incident and required medical treatment.

60

As noted in Jeffreys, it is defendants' burden to show that there is no evidence upon which a reasonable juror could find in plaintiff's favor. Fed. R. Civ. P. 56(c)(1). Unlike in Jeffreys on still another basis, Laster's medical records are consistent with his version of what occurred during his arrest, and there is no evidence that he made materially inconsistent statements to others regarding the incident. Whether or not his hand was broken in the manner asserted by plaintiff in his complaint or in his deposition is a matter for the jury. We therefore find defendants' argument that plaintiff's testimony should be discredited as a matter of law to be unavailing.

## C.   Personal Involvement of Defendants

Defendants next argue that plaintiff's excessive-force claim fails because he is unable to establish the personal involvement of any of the individual defendants. (See Defs.' Mem. of Law 14).

### 1.   Legal Standard

The personal involvement of a defendant in an alleged constitutional deprivation "is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir.

1994) (citations omitted). "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." Jeffreys v. Rossi, 275 F. Supp.2d 463, 474 (S.D.N.Y. 2003), aff'd sub nom. Jeffreys v. City of N.Y., 426 F.3d 549 (2d Cir. 2005) (citing, inter alia, Ricciuti v. N.Y. City Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997)). However, "a plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." Id.

2.  Analysis

i. Officer Vincent

Plaintiff asserts that Officer Vincent did nothing to intervene. However, it is undisputed that he took no part in the seizure of plaintiff. No evidence places Vincent in the room at the time of plaintiff's arrest, and in Vincent's own sworn testimony he affirmatively states that he was not there. (See Vincent Decl. ¶¶ 36-37). In plaintiff's deposition, he did not contradict that representation, and he focused instead on the fact that Vincent

62

subsequently did nothing to intervene with respect to medical treatment. It is therefore unclear exactly what, if anything, plaintiff is alleging with respect to Vincent's involvement in the use of excessive force. Plaintiff seems to allege that Vincent was in the apartment at the time that plaintiff was arrested (Dep. Tr. 39), but he admits that he bases this assertion on the general fact that Vincent was "one of the ones that helped - - - take me into custody", and that he does not actually recall Vincent being in the apartment. (Id.).

We therefore find that plaintiff has not raised a genuine dispute as to Vincent's presence, and consequently summary judgment should be granted as to Vincent on the excessive-force claim.

ii. <u>Detective Mancini</u>

With respect to Detective Mancini, summary judgment is not appropriate. Mancini admits that he participated in the handcuffing of plaintiff (<u>see</u> Mancini Decl. ¶¶ 31-35), negating any suggestion by defendants that he was not personally involved in any alleged use of excessive force.

63

Defendants attempt to circumvent Mancini's involvement by stating that he was not one of the ESU officers who put plaintiff on the ground (Defs.' Mem. of Law 19), and that that particular action would have happened so fast that Mancini would have been unable to intervene. (Id.). Defendants also argue that while plaintiff alleges that he was hit in the back of the head at least twice, he does not know or describe who hit him, and because Mancini denies striking plaintiff, Laster cannot raise a genuine issue of fact as to whether Mancini was personally involved. (Id. at 20). They similarly argue that even assuming plaintiff was hit in the head and that such force was unreasonable, he cannot establish that Mancini saw the act and had an opportunity to intervene. (Id. at 21).

Lastly, defendants assert that plaintiff cannot identify who twisted his hand while he was being handcuffed and that his allegation that it was Mancini is conclusory and unsupported. (Id. at 22). They focus on the fact that plaintiff at his deposition was unable to provide a description of the detective. (Id.). Thus, they contend, the fact that there were two people handcuffing plaintiff and that he was face-down during the encounter, unable to see, means that there is "insufficient evidence for a rational trier of fact to conclude, even assuming that the twisting of plaintiff's

right hand during the course of handcuffing constituted []
excessive force, that Detective Mancini was the individual who
allegedly twisted plaintiff's right hand." (Id. at 23). As with
their other arguments, defendants couple this contention with the
assertion that Mancini would also have been unable to intervene,
even if he had observed excessive force being used, because the
action was of such short duration. (Id. at 24).

We find defendants' line of reasoning to be unpersuasive. The
fact that Mancini was physically involved in handcuffing plaintiff,
(Mancini Decl. ¶¶ 31-35) gives rise to a plausible inference that
he was the one who twisted and broke plaintiff's hand.[6] Plaintiff
"need not establish who, among a group of officers, directly
participated in the attack and who failed to intervene", Jeffreys,
275 F. Supp.2d at 474, to survive summary judgment. With respect to
plaintiff's specific allegations regarding being shoved to the
ground and hit in the head, we similarly decline to find that there
is no genuine issue of fact regarding Mancini's personal
involvement. Accordingly, we recommend that summary judgment be
denied with respect to Mancini on plaintiff's excessive-force
claim.

_____

[6] Plaintiff also identified Mancini as the officer who asked
him where the gun was, an identification confirmed by Mancini
himself. (See Mancini Decl. ¶ 38).

### iii. Lieutenant Gribben

Gribben states that he was not present during plaintiff's arrest. In his declaration he states that an ESU officer requested that he remain in the hallway, and that from his position there, he was unable to see inside the apartment and did not observe plaintiff's arrest. (Gribben Decl. ¶¶ 17-19).

Plaintiff in his deposition asserted that Gribben was present in the apartment, and that he knew this because Gribben was the only one wearing a white shirt and displaying "lieutenant bars". (Dep. Tr. 40). Plaintiff was unable to say what Gribben looked like, but stated that, based on the paperwork provided in discovery and his recollection of the lieutenant bars, Gribben was present. (Id. at 41).

"The law is clear that a police officer has an affirmative duty to intervene and prevent the unlawful use of force by other officers in his presence." Skorupski v. Suffolk Cnty., 652 F. Supp. 690, 694 (E.D.N.Y. 1987). The court in Skorupski denied summary judgment where all defendants admitted to being present, although plaintiff could not specify who actually hit him. Id. While Gribben denies that he was present, plaintiff's deposition testimony offers

66

sufficient evidence to create a genuine dispute as to the material fact of Gribben's presence at the time of plaintiff's arrest. We therefore find a grant of summary judgment to be inappropriate with respect to Gribben.

### iv.  Conclusion as to Personal Involvement

In sum, defendants have not shown an absence of dispute as to whether defendants Mancini and Gribben were personally involved in any excessive use of force against plaintiff. They have, however, demonstrated that there is no genuine dispute that Vincent was not present during plaintiff's arrest. We therefore recommend that summary judgment be granted on plaintiff's excessive-force claim with respect to Vincent, and denied with respect to Mancini and Gribben.

### II.  Qualified Immunity

Defendants next argue that they are protected by the doctrine of qualified immunity.

67

A.   Legal Standard

The doctrine of qualified immunity serves to protect public officials from liability in section 1983 actions insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Purnell v. Lord, 952 F.2d 679, 683-84 (2d Cir. 1992). The doctrine applies an objective standard to actions of government officials arising from performance of their discretionary functions. Harlow, 457 U.S. at 818.

Individual defendants are "'shielded from liability for civil damages'" under 42 U.S.C. § 1983 if "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Layne, 526 U.S. 603, 609 (1999) (quoting Harlow, 457 U.S. at 818); accord Gilles v. Repicky, 511 F.3d 239, 243 (2d Cir. 2007). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (quoting Young v. Cnty.

of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)).

A public official is entitled to qualified immunity if "'(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act.'" Jenkins v. City of N.Y., 478 F.3d 76, 87 (2d Cir. 2007) (quoting Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001)) (internal quotation marks omitted); see Field Day, LLC v. Cnty. of Suffolk, 463 F.3d 167, 191 (2d Cir. 2006); Curry v. City of Syracuse, 316 F.3d 324, 334 (2d Cir. 2003). Since qualified immunity is an affirmative defense, defendants "bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." Varrone v. Bilotti, 123 F.3d 75, 78 (2d Cir. 1997). Where there are triable disputes as to the circumstances that could dictate whether a defendant could reasonably believe that his conduct was lawful, summary judgment based on an immunity defense must be denied. See, e.g., Curry, 316 F.3d at 334; Kent v. Katz, 312 F.3d 568, 576-77 (2d Cir. 2002).

We also note here that the traditional qualified-immunity analysis mandated by the Supreme Court's decision in Saucier v.

Katz, 533 U.S. 194 (2001), required that courts engage in a two-step sequence in making determinations on qualified-immunity claims. First, a court was required to decide whether the facts alleged by plaintiff were sufficient to make out a violation of a constitutional right. Second, if the plaintiff satisfied that test, the court was to determine whether the right at issue was "clearly established" at the time of the alleged misconduct. See Pearson v. Callahan, 555 U.S. 223, 232 (2009) (discussing Saucier). However, more recently the Supreme Court has stated that the Saucier test "should not be regarded as an inflexible requirement." Id. at 227. Rather, courts have discretion in determining which of the two questions should be decided first. Id. at 236.

B.   Analysis

Defendants assert that because their actions were objectively reasonable, they are entitled to qualified immunity. They argue that plaintiff cannot demonstrate that they actually violated his clearly established constitutional rights.

Plaintiff's remaining claims are for excessive force and denial of medical care. The excessive-force claim is analyzed under the Fourth Amendment's reasonableness standard. It is "axiomatic

70

that . . . [the] right under the Fourth Amendment to be free from excessive force [] is clearly established." Hodge v. Village of Southampton, 838 F. Supp.2d 67, 85 (E.D.N.Y. 2012) (citing Maxwell v. City of N.Y., 380 F.3d 106, 108 (2d Cir. 2004)). Furthermore, it was clearly established as of the date of the alleged violations. See, e.g., Petway v. City of N.Y., 2005 WL 2137805, at *10 (E.D.N.Y. Sept. 2, 2005) (pre-dating Laster's arrest) ("There can be no doubt that the right to be free from excessive use of force was clearly established at the time of the incident." (citing Graham, 490 U.S. at 395)). Similarly, the right to be free from deliberate indifference to serious medical needs was well settled at the time of plaintiff's arrest. See, e.g., Carrasquillo v. City of N.Y., 324 F. Supp.2d 428, 440-41 (S.D.N.Y. 2004)(pre-dating Laster's arrest)("The Eighth Amendment right to receive adequate medical treatment is both clearly established and well-settled, so deliberate indifference . . . [is] never objectively reasonable." (citing Estelle, 429 U.S. at 104-05)).

With respect to whether defendants' conduct violated plaintiff's clearly established right to be free from excessive force, they argue that whatever force the officers may have used was reasonable under the circumstances. The ESU officers were told that plaintiff was armed, and therefore, they assert, it was

71

reasonable for them to believe that plaintiff posed a risk to their safety and the safety of others. (See Defs.' Mem. of Law 28). Moreover, they contend, plaintiff moved towards the fire-escape when they entered the apartment, creating a potential flight situation where "anticipated resistance could become violent or even deadly." (Id.). Thus, it was "objectively reasonable for officers to take plaintiff to the ground to prevent plaintiff from escaping and to eliminate the possibility that plaintiff would open fire upon the officers." (Id.).

While it may have been reasonable for defendants to use some amount of force during plaintiff's arrest, defendants do not address plaintiff's allegations that he was hit in the head and that his hand was twisted so hard that it was broken. (Dep. Tr. 42, 46-47). There appear to be genuine disputes as to the amount of force used and thus the reasonableness of that force, and accordingly we cannot find, as a matter of law, that defendants had reason to believe that they were not violating Laster's clearly established constitutional right to be free from excessive force. That is a question for a finder of fact, and is not properly determined on a summary judgment motion. We therefore recommend that defendants' qualified-immunity defense on the excessive-force claim be rejected.

As for the denial-of-medical-care claim, defendants do not specifically discuss the immunity defense. Rather, they cite only facts relating to the use of force during the arrest, and argue that qualified immunity is warranted because the officers' actions were "objectively reasonable." (Defs.' Mem. of Law 28). In view of their failure even to attempt to justify qualified immunity on the medical claim, it must be rejected at this stage.

III. The New York City Police Department

Defendants next target the inclusion of the NYPD as a defendant. They argue that because the NYPD "is not a suable entity," any claims lodged against it should be dismissed. (See Defs.' Mem. of Law 29 (citing Koulkina v. City of N.Y., 559 F. Supp. 2d 300, 315 (S.D.N.Y. 2008))). Section 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency". New York City Charter § 396 ch. 16. This law has been read to cover suits against the City of New York, see, e.g., East Coast Novelty Co. v. City of N.Y., 781 F.Supp. 999, 1010 (S.D.N.Y. 1992), and therefore if a plaintiff means to sue for the wrongdoings of a City agency, he should name the City of New York as the defendant.

73

Although plaintiff failed to name the City as a defendant, pro se pleadings "must be construed liberally and interpreted 'to raise the strongest arguments they *suggest*,'" Triestman, 470 F.3d at 474 (quoting and adding emphasis to Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)). We believe that in naming the NYPD in his complaint, plaintiff meant to bring suit against whichever institution might be responsible for the conduct of the individual police personnel he named. Therefore, we read his complaint as "suggesting" a claim against the City of New York.

However, even assuming that plaintiff intended to name the City as a defendant, his claim fails. In support of the dismissal of any claims against the City, defendants argue that plaintiff has failed to plead any theory of liability as to the City. (See Defs.' Mem. of Law 29 (citing Fed. R. Civ. P. 8(a))). While the City may be held liable under Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694 (1978), in appropriate circumstances, plaintiff has not asserted facts to support such a claim. His allegations target specific officers, and he makes no assertion that the actions of the officers were the result of a policy or procedure instituted by the City, which is a predicate for municipal liability under section 1983. Id. We therefore recommend that defendants' motion for summary judgment as to the NYPD be granted.

74

IV. <u>State-Law Claims</u>

Lastly, defendants argue that to the extent that any of plaintiff's allegations could be construed as state-law claims, they must be dismissed because plaintiff failed to comply with the New York General Municipal Law by filing a notice of claim.

Construing plaintiff's complaint liberally, we can interpret his pleading as asserting, along with his federal claims, parallel state-law claims. In order to assert a claim against a city or an officer or agent of the city, a plaintiff must comply with section 50-i of the New York General Municipal Law, which states that

> No action . . . shall be prosecuted or maintained against a city . . . for personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of negligence or wrongful act of such city . . . or any officer, agent or employee thereof . . . unless a notice of claim shall have been made and served upon the city.

Although section 50-i refers only to claims asserted against a municipality or its agencies, the New York courts have held that any tort claim pressed against a City official who would be entitled to indemnification by the City must be the subject of an administrative claim under the General Municipal Law. <u>See</u> <u>e.g.</u>, <u>Int'l Shared Servs., Inc. v. County of Nassau</u>, 222 A.D.2d 407, 408,

75

634 N.Y.S.2d 722, 724 (2d Dep't 1995); see also Petway v. City of N.Y., 2012 WL 2254246, at *8 (E.D.N.Y. June 14, 2012) (dismissing state-law claims for failure to comply with New York's General Municipal Law procedural requirements).

The provision governing indemnification by the City of New York is section 50-k of the General Municipal Law. It requires indemnification of a municipal employee if his liability arose from conduct "within the scope of his public employment and in the discharge of his duties," provided that the employee was "not in violation of any rule or regulation of his agency at the time the alleged damages were sustained" and that the injury did not arise "from intentional wrongdoing or recklessness on the part of the employee." N.Y. General Municipal Law § 50-k(3).

Plaintiff admitted in his deposition that he had not filed a notice of claim. (Dep. Tr. 7). However, this is not necessarily fatal to his assumed state-law claims, as it is unclear whether the conduct cited by plaintiff as the basis for his claim constituted "intentional wrongdoing or recklessness". If a jury were to find that defendants Mancini and Gribben acted intentionally while using excessive force in arresting plaintiff, that verdict would necessarily encompass a finding that they had engaged in

76

intentional wrongdoing. <u>See</u>, <u>e.g.</u>, <u>Brenner v. Heavener</u>, 492 F. Supp.2d 399, 405 (S.D.N.Y. 2007) (holding that claims alleging ordinary acts of negligence would fall into the category of claims for which the City has an obligation to indemnify, but not those asserting more extreme intentional misconduct, such as use of excessive force); <u>accord</u> <u>Jean-Laurent v. Hennessy</u>, 2008 WL 3049875, at * 11 (E.D.N.Y. Aug. 1, 2008) (denying summary judgment where "a rational fact-finder could find that defendants intentionally hit plaintiff's head . . . and that this constituted an objectively unreasonable use of force that resulted in compensable injury."). Similarly, if it were shown that Officer Vincent deliberately withheld medical care that he knew was needed and did so without a colorable basis, he might be found not to be entitled to indemnification. Therefore, a decision by a factfinder regarding the merits of plaintiff's section 1983 excessive-force and medical-care claims is necessary before it can be determined whether plaintiff's assumed state-law claims should be dismissed for failure to comply with procedural requirements.

<u>CONCLUSION</u>

In sum, we recommend that defendants' motion for summary judgment be granted in part and denied in part. We recommend (1)

that plaintiff's claim for false-arrest/unlawful-entry be dismissed; (2) that plaintiff's claim for denial of medical care be dismissed only as to defendants Mancini and Gribben; (3) that plaintiff's excessive-force claim be dismissed only as to Officer Vincent; (4) that the NYPD be dismissed as a defendant; (5) that defendant officers' qualified immunity defense be denied; and (6) that any state-law claims remain in the case.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Deborah A. Batts, Room 2510, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
       September 28, 2012




                         RESPECTFULLY SUBMITTED,


                         _____
                         MICHAEL H. DOLINGER
                         UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been mailed
this date to:

Mr. Tyrone Laster
#59500-054
FCI Marianna
Federal Correctional Institution
P.O. Box 7007
Marianna, FL 32447

Bradford Collins Patrick, Esq.
Anna Nguyen Fretel, Esq.
Noreen M. Stackhouse, Esq.
New York City Law Department
100 Church Street
New York, NY 10007